UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRYCE POPE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00240-JMS-MJD |
| | ) | |
| SAMUEL BYRD M.D., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Bryce Pope, an Indiana Department of Correction ("IDOC") inmate, filed this civil rights suit alleging that Defendants were deliberately indifferent to his serious medical needs after he tore his Achilles tendon. Defendants have moved for summary judgment. Dkt. [33]. For the reasons below, that motion is **GRANTED**.

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

1

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Pope and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

**A.  The Parties and Relevant Policies**

Mr. Pope was at all relevant times an IDOC inmate housed at Wabash Valley Correctional Facility ("Wabash Valley"). Dkt. 42 at 4 (Pope Aff.).

Samuel Byrd, MD, is a primary care physician and Wabash Valley's Site Medical Director. Dkt. 34-4 at ¶ 4 (Byrd Aff.). His responsibilities include providing direct clinical services for patients and clinical supervision for medical staff. *Id.* at ¶ 7. He also provides medical assessments and evaluations, and treatment for emergent, urgent, routine, and chronic medical issues. *Id.* at ¶ 6.

Sara Bedwell is the Health Services Administrator ("HSA") at Wabash Valley. Dkt. 34-3 at ¶ 3. Her job duties include ordering medical supplies for the facility, hiring nursing staff, maintaining the nursing staff schedule, responding to inmate healthcare request forms and grievances, and dealing with human resources issues for the medical staff. *Id.* at ¶ 6.

Barbara Riggs, RN, the Director of Nursing at Wabash Valley, is responsible for providing clinical, educational, and professional supervision for nursing and support staff. Dkt. 34-5 at ¶¶ 3-4.

Defendants are employed by MHM Health Professionals, LLC, d/b/a Centurion Professionals ("Centurion"), the private company that contracts with IDOC to provide medical services to IDOC inmates. Dkt. 34-3 at ¶ 3; dkt. 34-4 at ¶ 3; dkt. 34-5 at ¶ 3. None of the defendants are responsible for scheduling patients within the facility or with outside providers; rather, scheduling coordinators handle these duties. Dkt. 34-3 at ¶ 12; dkt. 34-4 at ¶ 18; dkt. 34-5 at ¶ 5.

With respect to specialty services, an onsite provider submits a request for prior authorization for specialty services to Centurion, who reviews the request and, if the criteria are met, approves the service. Dkt. 34-6 at 9 (Centurion Provider Manual). The approval must be granted before the service can be scheduled. *Id.* at 22-23. An office scheduler then coordinates with the outside service to schedule the inmate for the specialty service. Dkt. 34-3 at ¶ 12.

B. **Mr. Pope's Injury and Treatment in the Days after the Injury**

Mr. Pope was playing basketball on September 20, 2022, when he tore his Achilles tendon. Dkt. 42 at 4, ¶ 1. Mr. Pope was carried to the infirmary for treatment. *Id.* At the infirmary, a nurse directed him to return to his cell and submit a healthcare request form. *Id.* at ¶ 2. Mr. Pope submitted a healthcare request form that was processed on September 21 that said he believed his Achilles tendon was torn because he "heard something pop." Dkt. 34-1 at 6 (Medical Records).

Mr. Pope was seen nurses Kayla Kellems and Kim Hobson on September 28. *Id.* at 36-37. Nurse Kellems conducted an ultrasound which showed an irregular Achilles tendon shear, suggesting "subacute/chronic change from partial thickness tear." *Id.* at 168. There was no evidence of full-thickness tear or distracted tendon fragments. *Id.* As a result of this visit, crutches

3

and ibuprofen were ordered for Mr. Pope; he was provided a lower-bunk pass; and he was directed to be non-weightbearing and to apply ice as needed to the injury. *Id.* at 37. Nurse Kellems also approved a 7-day "lay-in," during which an inmate is excused from work and other activities and has all meals and medications delivered to him. *Id.* at 6.

Mr. Pope saw Nurse Kellems on October 5, at which time he reported that his ankle felt a little better after resting, icing, compressing and elevating (aka "RICE") his injury, but that his leg remained swollen. *Id.* at 38. Nurse Kellems instructed Mr. Pope to remain non-weightbearing and to continue using crutches. *Id.* at 45. She ordered prescription naproxen for pain control and inflammation. *Id.* Nurse Kellems also instructed Mr. Pope to remain on lay-in for an additional 7 days and to follow up with a provider the next week. Finally, she advised Mr. Pope to continue wearing compression stockings as well as an air boot for added support to his calf, and to continue icing and elevating his ankle. *Id.* at 40. Mr. Pope was provided a walking boot the same day. *Id.* at 45. Nurse Kellems submitted a request for Mr. Pope to receive an MRI, which Centurion approved. *Id.* at 41; dkt. 34-6 at 9.

Mr. Pope's MRI was conducted at Terre Haute Regional Hospital on October 14. Dkt. 34-1 at 48. After receiving the results, which showed an Achille tendon rupture, Nurse Kellems submitted a request for an orthopedic consult on October 17. *Id.* at 49, 162. Nurse Kellems reviewed the MRI results with Mr. Pope during a telehealth visit two days later, during which Mr. Pope reported that the Naproxen had helped his leg pain. *Id.* at 52. Nurse Kellems told Mr. Pope's counselor that he was to remain non-weightbearing and on lay-in until he could be seen by an orthopedic surgeon. *Id.* at 52. She also provided Mr. Pope an ice pass and encouraged him to continue using the RICE method for his ankle. *Id.*

4

On November 9, Mr. Pope had a consultation with orthopedic surgeon Dr. Kurt Madsen at Terre Haute Regional Hospital, and Dr. Madsen recommended surgery. *Id.* at 160. Dr. Byrd submitted a request to Centurion to approve the suggested surgery the following day. *Id.* at 57.

On November 15, Mr. Pope submitted a healthcare request form, stating, "I have a torn [A]chilles tendon and I'm awaiting surgery. In the meantime, my toes are getting numb and cold at night while I'm elevating my leg. Would this be affecting circulation?" *Id.* at 9. Dr. Byrd saw Mr. Pope two days later and submitted a request for approval of a venous doppler ultrasound of Mr. Pope's right leg. *Id.* at 60-61. That ultrasound was taken on November 23 and showed no deep vein thrombosis. *Id.* at 159.

### C.  Mr. Pope's Treatment Related to Surgery

Mr. Pope had the Achilles tendon repair surgery with Dr. Madsen on December 16, 2022. Dkt. 34-1 at 151. The surgical incision was closed with staples, and the area was covered by a short-leg cast. *Id.*

Upon Mr. Pope's return to Wabash Valley, he had discharge instructions to keep the cast clean and dry, continue using crutches, and to stay 50% weightbearing. *Id.* at 156. Dr. Byrd ordered Ultram for pain control that Mr. Pope was to take as needed for a week. *Id.* at 65.

On December 30, Mr. Pope submitted another healthcare request form asking about when he would have his cast and staples removed. *Id.* at 11. Nurse Lantrip responded, "Cast and staples removed on 1/1/23. Wear walking boot until released by Orthopedic surgeon." *Id.*

Mr. Pope saw Dr. Madsen for a follow-up visit on January 11, 2023. *Id.* at 150. Dr. Madsen observed that Mr. Pope was healing well despite some swelling, and he recommended weightbearing as tolerated in a boot and following up with him in three weeks. *Id.*

Mr. Pope saw Nurse Casey Jacobs-Campbell on January 17, during which she advised him to use the RICE method and to continue using the walking boot. *Id.* at 72-73. She noted that she was awaiting word from Dr. Madsen that Mr. Pope could be ready for physical therapy. *Id.* at 73. Dr. Byrd explained that beginning physical therapy too soon after surgery would have created a risk of additional pain and swelling and could delay healing, which is why no one submitted a request for Mr. Pope to begin physical therapy until after Dr. Madsen approved it. Dkt. 34-4 at ¶¶ 29-30.

Mr. Pope submitted another healthcare request form on January 29, claiming his leg was stiffening up and requesting the status of his physical therapy. Dkt. 34-1 at 10. He also advised in the form that he had run out of his anti-inflammatory medication on January 13. *Id.*

Mr. Pope saw Nurse Chantell Knepp on February 2. *Id.* at 75. Mr. Pope requested a lay-in for meals, but she noted that Mr. Pope had been working at the prison barbershop and using his foot when he was supposed to be on lay-in. *Id.* at 75. Because of that, Dr. Byrd denied the request for the lay-in. *Id.* Nurse Knepp also noted that Mr. Pope had been scheduled for a follow-up with Dr. Madsen. *Id.* at 10.

Mr. Pope saw Dr. Madsen for a follow-up visit on February 27, during which Dr. Madsen recommended weightbearing as tolerated in the walking boot and for Mr. Pope to start flexion and extension exercises. *Id.* at 81, 147.

Nurse Jacobs-Campbell ordered Tylenol for pain control on March 8 and another medication for Mr. Pope's elevated blood pressure. *Id.* at 84. On March 20, she also submitted a request for Centurion to approve Mr. Pope's physical therapy. *Id.* at 87-88.

Mr. Pope submitted another healthcare request form on March 27 in which he said he had been experiencing pain and swelling throughout his recovery. *Id.* at 8. He requested a refill of his Tylenol because it had been confiscated during a cell search. *Id.*

Mr. Pope saw physical therapist Adoniah Mukona on March 28 for an evaluation. *Id.* at 90-95. Mr. Mukona prescribed exercises and stretches and recommended that Mr. Pope stop wearing the walking boot. *Id.* A nurse responded to Mr. Pope's latest request form that day, stating that she informed the pharmacy about his need for Tylenol and recommending that he do his prescribed physical therapy exercises. *Id.*

On April 3, Mr. Pope saw Dr. Madsen again, who noted that Mr. Pope's incision had healed. *Id.* at 107. Dr. Madsen recommended an ASO strap and physical therapy two times a week for 4-6 weeks. *Id.* at 143.

The next day, Nurse Jacobs-Campbell submitted a request to Centurion for offsite physical therapy, which was "partially approved" for one weekly offsite visit and one weekly onsite visit. *Id.* at 106, 141. In the month of May, Mr. Pope attended physical therapy twice at Terre Haute Regional Hospital and once at Wabash Valley. *Id.* at 118-19, 137, 139. Mr. Pope also met with Nurse Jacobs-Campbell to discuss his physical therapy progress. *Id.* at 112-13. Mr. Mukona discharged Mr. Pope from onsite physical therapy on May 23, concluding that Mr. Pope's swelling had disappeared; his gait was back to normal; he had full range of motion; and he was capable of continuing with home exercises. *Id.* at 125-27.

### D. Mr. Pope's Grievance

Because Mr. Pope brings a claim against HSA Bedwell, the Court discusses the grievance he filed related to the time Mr. Pope had to wait for surgery.

Mr. Pope submitted a grievance on November 29, 2022, in which he complained about how long he was waiting for his surgery. Dkt. 34-2 at 3. By that date, Dr. Byrd had already submitted the request for surgery, and it was in the process of being approved. Dkt. 34-4 at ¶ 17. His grievance was forwarded by email to Ms. Bedwell on November 30. Dkt. 34-2 at 3. Assistant HSA Melissa Corrigan completed a form on December 7, indicating that Mr. Pope was scheduled for surgery "very soon." *Id.* at 5.

The grievance form with the same message, however, wasn't returned to Mr. Pope until December 22, after he had received his surgery. *Id.* at 9-10. Mr. Pope signed the grievance on December 29. *Id.* at 10. He subsequently appealed the grievance, complaining about the delay in receiving the surgery and arguing the surgery had occurred on December 23 instead of December 16, as reflected in his medical records. *Id.* at 8.

After being processed, Mr. Pope's grievance appeal was returned to him on January 26, 2023, with a response from "M. Ellis" that "health services advises that you are scheduled for surgery. We are at the mercy of outside providers when it comes to scheduling. Appeal denied." *Id.* at 12.

### III.
### Discussion

Mr. Pope alleges that Defendants were deliberately indifferent to his Achilles tendon injury because of the delay in getting him pain medication; the delay in getting him surgery; the ineffectiveness of the pain medication provided; and because he did not receive physical therapy as directed by Dr. Madsen. Dkt. 10 at 2-3 (Screening Order).

#### A.  Legal Standard

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to

incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Defendants don't dispute that Mr. Pope's torn Achilles tendon was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that they acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Pope's]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

"The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up). A defendant must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). In other words, "deliberate indifference requires 'more than negligence and approaches intentional

wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)).

A medical professional may be deliberately indifferent if he persists in treatment known to be ineffective. *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021). Delaying access to medication or treatment which unnecessarily prolongs a plaintiff's pain may demonstrate deliberate indifference. *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). Another indication of deliberate indifference is when a prison medical provider "refuses to take instructions from a specialist." *Petties*, 836 F.3d at 729.

The Court examines the totality of Mr. Pope's medical care when evaluating whether Defendants were deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

### B. Defendants Bedwell and Riggs

Mr. Pope alleged in his complaint that HSA Bedwell was deliberately indifferent because she "failed to ensure that Centurion Health Services authorized the Plaintiff's consult, surgery, and physical therapy in a timely manner." Dkt. 2 at 2. But Ms. Bedwell was not involved in scheduling any of Mr. Pope's care; that was the responsibility of office schedulers. Dkt. 34-3 at ¶ 12. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). The only evidence of Ms. Bedwell's involvement was coordinating the response to his grievance about the delay in scheduling his surgery, and by that time, the surgery was in the process of being scheduled. Dkt. 34-2. Accordingly, Ms. Bedwell is entitled to summary judgment. *See also Machicote*, 969 F.3d at 828 (affirming grant of summary judgment for health services manager, as she had no role in plaintiff's medical care beyond fielding a nurse's complaints about him).

10

Likewise, Nurse Riggs is entitled to summary judgment due to her lack of involvement in Mr. Pope's care. Mr. Pope alleged that Nurse Riggs was deliberately indifferent for failing to supervise nurses to ensure that they were providing proper care for him. Dkt. 2 at 4. In his memorandum opposing summary judgment, he argued that she failed to implement various nursing protocols to ensure that his treating nurses were providing him with proper pain medication and other treatment. Dkt. 41 at 14-16. "Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). Although a supervisor may be liable if she is aware of a subordinate's constitutional violation and approves, condones, or turns a blind eye to it, *Gonzalez v. McHenry County, Ill.*, 40 F.4th 824, 828 (7th Cir. 2022), there is no evidence in the record that Nurse Riggs was aware of the treatment that Mr. Pope's treating nurses were providing.[1] Accordingly, she, too, is entitled to summary judgment for lack of personal involvement.

### C. Defendant Byrd

Dr. Byrd did have direct involvement in Mr. Pope's care, but—examining the totality of that care—the Court readily concludes that he, too, is entitled to summary judgment.

With respect to delays in seeing outside providers, Dr. Byrd did not make the initial request for Mr. Pope to obtain an MRI. Nurse Kellems did on October 5, 2022, which was quickly approved by Centurion. Dkt. 34-1 at 41, 48. Based on the results of the MRI, Nurse Kellems requested an orthopedic consultation, which was also approved. *Id.* at 49, 162.

---

[1] Further, Nurse Riggs would only be liable as a supervisor if she turned a blind eye to a supervisee nurse's deliberate indifference. The record demonstrates that the nurses were responsive to Mr. Pope's complaints and provided him with various means to stay comfortable as he awaited surgery.

11

Dr. Byrd's initial direct involvement in Mr. Pope's care was on November 10, 2022, when he submitted a request for Mr. Pope to receive surgery based on Dr. Madsen's recommendation from their consultation the day before. *Id.* at 57, 160. Thus, rather than refuse to follow a specialist's recommendation, *see Petties*, 836 F.3d at 729, Dr. Byrd immediately followed that recommendation. Dr. Byrd wasn't involved in scheduling the surgery, which takes time due to the surgeon's availability and the practicalities of scheduling an inmate for an outside medical procedure. Dkt. 34-4 at ¶¶ 18-20. And despite the lack of immediate access to surgery, Mr. Pope received medical care in the form of recommendations that he not bear any weight on that leg; that he rest, ice, and elevate his leg; a boot to help with immobilizing his leg; pain medication; and a lay-in so that Mr. Pope was not unnecessarily moving around. *Petties*, 836 F.3d at 732 (noting that immobilizing the Achilles tendon is within the standard of care for treatment to prevent injury and pain).

The first time Dr. Byrd saw Mr. Pope as a patient was on November 17, after Mr. Pope submitted a healthcare request form due to leg pain. Dkt. 34-1 at 9, 60-61. Dr. Byrd sought and received approval for an ultrasound, which revealed no deep vein thrombosis. *Id.* at 159.

Dr. Byrd's next direct involvement with Mr. Pope's care was prescribing pain medication upon Mr. Pope's release from the hospital after surgery. *Id.* at 65. While Mr. Pope complains about the effectiveness of this pain medication, nothing in the record indicates that he informed Dr. Byrd that the medication was not treating his pain adequately. And with respect to his subsequent requests for pain medication, those were handled by his treating nurses, not Dr. Byrd. *Id.* at 10, 84 (Nurse Jacobs-Campbell responding to healthcare request forms regarding medication fills). Thus, even assuming that Mr. Pope remained in pain due to this injury, there is no evidence that Dr. Byrd was aware of any problems with the medication. *See Machicote*, 969 F.3d at 827 (noting that to

survive summary judgment on a claim regarding pain, plaintiff must "put forth evidence from which a jury could find that the defendants actually knew about the pain and recklessly disregarded or needlessly prolonged it."). Further, "[t]he Eighth Amendment does not guarantee a patient his preferred medication or a pain-free recovery." *Weightman v. O'Brien*, No. 24-1543, 2025 WL 487214, at *3 (7th Cir. Feb. 13, 2025) (citing *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023)).

Mr. Pope also alleges that there was a delay in providing his physical therapy. But as Dr. Byrd explained, any delay in beginning physical therapy was based on the medical decision that doing so too early could risk exacerbating Mr. Pope's pain or delaying healing. Dkt. 34-4 at ¶ 29. Thus, medical staff at Wabash Valley did not submit a request for physical therapy until late March, which was quickly approved by Centurion. Medical staff also reasonably deferred to Dr. Madsen's decision as to when it was reasonable to begin physical therapy.

Looking at the totality of Mr. Pope's care by Dr. Byrd, no reasonable juror could conclude that he was deliberately indifferent. Accordingly, he is entitled to summary judgment.

## IV.
## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. Dkt. [33]. Final judgment consistent with this Order and the Court's July 28, 2023, Screening Order, dkt. [10], will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 2/27/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

BRYCE POPE
985038
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All Electronically Registered Counsel